Moncure, P.
delivered the opinion of the court.
The principal questions involved in the case are, *457 whether the debt in controversy was a good money debt, or a Confederate money debt, and if the latter, whether it should be scaled, and if so, in reference to what time the scale should be applied, whether to the time of the date of the note, or to the time of its maturity? The court below decided that the debt was a Confederate money debt, that it ought to be scaled, and that the scale should be applied in reference to the time of the dale of the note, and not the time of its maturity. Another question arose, and was decided in the case, which will sufficiently appear in the opinion about to be delivered.
The note in question was made by B. Ashby & Sons; was dated the 19th day of April 1862; was payable twelve months after date to Colin C. Porter, and was for the sum of $7,723.24. The origin of the note was as follows:
B. Ashby & Sons at that time resided and were engaged as partners in the manufacture of flour in the county of Clarke. They were indebted before the war in various notes to the Farmers Bank of Virginia at Winchester, which were renewed from time to time, and afterwards consolidated into one note. This note was discounted on the 30th of January 1862, was payable at said bank sixty days after date, and was due March 31st and April 3d, 1862, when it was protested for non-payment. On the 7th of March 1862 the bank removed from Winchester toFarmville, and there continued open and doing business till the close of the war. Ashby & Sons were anxious to take up their note, thus being under protest at the bank in Farm-ville, but not finding it convenient to do so, or to go to Farmville for that purpose, they made an arrangement with Porter to take it up for them. He was at that time a resident of the adjacent county of Jeffer *458 son, in West Virginia, and was largely engaged in manufacturing and selling woollen goods, and his business frequently required him to go or send to Richmon(^ > iQ facf was engaged in the business of blockade running, as it was called. He had money to invest, and did not know what to do with it. Ashby & Sons said to him they had a note at the bank in Farm-ville under protest, and were anxious to pay it. Porter told them that his agent, Young, had to go to Richmond to sell some goods, and might go on to Farm-ville and pay it for them. Ashby & Sons then said they would give their note with security to Poi’ter for-the amount. He said he did not require security, and it was agreed between them that if he demanded a return of the money, when they could not raise it, he would take flour for it, at a price which was then agreed upon between them. There was no agreement or understanding between the parties about the currency in which the debt was to be paid by Porter to the bank. Nothing was said on that subject. Almost the only currency which then existed in Winchester or in Farmville, or elsewhere in the state, not in the hands of the enemy, was Confederate currency, and the said bank, and all other banks in the state, where that currency existed, received it in payment of debts, due to them. Young, the agent of Porter, in pursuance of the arrangement aforesaid, went on from Richmond to Farmville, paid the note of Ashby & Sons to the bank, received it, and brought it to them, took from them another note, payable to Porter at twelvemonths, for the amount of the debt, including interest and charges of protest, being the note for $7,723.24 aforesaid, and returned to them their note to the bank. The payment was made by Young to the bank in Confederate currency. Nothing was said by the parties, or- *459 either of them, as to the currency in which the new note was to be paid. That note was not paid at maturity, nor was any payment made on account of it during the war. After the close of the war the controversy involved in this suit arose between the parties, and the court below decreed in the suit as before stated; and from that decree this appeal was taken. My opinion upon the several points presented by the appeal is as follows:
First. I am of opinion that the debt due by Buckner Ashby & Sons to the Farmers Bank of Virginia at Winchester, which was paid by Colin C. Porter for said Ashby & Sons in April 1862, after the removal of said bank from Winchester to Farmville, during, and in consequence of the war, was, at the time of such payment, a specie or good money debt. It was due by a note dated the .30th day of January 1862, payable sixty days after date, for §7,700, and discounted on the day of its date by said bank for said firm. It was made and discounted as a renewal of notes before made and discounted at the said bank, which notes were in their origin ante-war debts, and of course payable in specie or good money, and the presumption in the absence of any evidence to the contrary is, that the said note, made in continuation of the same loan and accommodation, was intended to be payable in the same currency.
The said note, being at the time of its payment a good money debt, it would have been competent for the bank, the holder of the note, instead of receiving payment in Confederate money at par, to . have demanded payment in good money. And it would have been competent for the bank, instead of receiving payment of the note in Confederate money from the debtor, to have sold and assigned it to Porter or any *460 other person, in consideration of the same amount of Confederate money received from such assignee. And in that case it would have been competent for the assisnee *° have demanded payment of the note in good money. He would have been invested, by virtue of the assignment, with all the rights and remedies of the assignor in regard to the note. But,
Secondly. I am of opinion that Porter did not become the assignee of the note by paying the amount of it to the bank. There was no privity of contract between him and the bank in regard to the note. Its payment by him had the same effect in regard to the bank, and in regard to the continued existence of the note, as its payment by Ashby & Sons would have had. It was in effect paid by them, so far as the bank was concerned. So that Porter could not have maintained an action at all upon the note, either in his own name or in that of the hank, much less could he have recovered in such an action the amount of the note in good money. In the absence of any express contract between him and Ashby & Sons, his only right of action against them, arising from such payment, was an action of indebitatus assumpsit for so much money paid to their use, and the measure of his right of recovery in such action would have been the precise amount so p$id. Having paid the par amount of the note in Confederate money, he would have been entitled to recover the value of such amount, at the time of such payment, with interest thereon from that time.
Thirdly. I am of opinion that the circumstances under which the payment was made by Porter, for Ashby & Sons, did not render the latter liable to him for any greater amount than they would have been liable for had the payment been made at their mere request. There was certainly no express promise by *461 Ashby & Sons to pay to him any greater amount in value than it was necessary for him to pay in discharge of the note, even supposing that such a promise would have been free from the taint of usury; a point which need not be decided in this case, according to my view of it. It is not at all improbable, nay, it is probable, that Porter expeeted to receive good money from Ashby & Sons in payment of the amount he had paid for them in Confederate money in discharge of the note. His object was to make a good investment of his Confederate money, and we cannot see how he could have done so by receiving the same amount of the same kind of money at some future period. His going or sending to Parmville, to make the payment, was attended with trouble and expense, for which it seems no charge was made by him to them. He might have made profit on his'Confederate money by trading upon it in the business of blockade running, in which he was engaged, or in buying land. He no doubt thought he would do better by investing it in a specie debt, which he probably supposed he was doing. He might perhaps have effected his object by negotiating with the bank, and obtaining from it an assignment of the note, instead of negotiating with Ashby & Sons, and making payment of the debt for them.
But while such was probably the expectation of Porter, the circumstances of the case do not warrant us in saying that such was the expectation or intention of Ashby & Sons, or that they intended to make any other contract than that which was implied in the payment of the money by him for their use and at their request. They may well have supposed that Porter, having perhaps more Confederate money than he needed, might have been willing to accommodate them by taking up *462 their note to the bank, which he could hold at less risk than the same amount of Confederate money. They may have supposed that Porter had other business a^ i’armvike, as he certainly had at Richmond, and would have incurred no additional expense in taking up the note for them, or that he would charge them any additional expense incurred by him in so doing; which they would no doubt readily have paid, if notified of the fact that such expense was incurred. They no doubt knew that the banks were receiving Confederate money at par in payment of debts due to them, and therefore knew that this debt to the bank could be paid in the same way. It is not to be presumed, in the absence of any evidence tending to prove the fact, that they would have given up the advantage of making payment in that way. I think, therefore, that there is not sufficient evidence in this case that there was any agreement of the parties, express or implied, that Ashby & Sons should be liable to. Porter for any greater amount than that which Porter paid in discharge of their debt to the bank. x
Fourthly. I am of opinion that the execution of the note by B. Ashby & Sons to C. C. Porter for $7,728.24, with interest from date, dated' the 19th day of April 1862, payable twelve months after date; the said principal sum being the amount paid on the day of its date by the said Porter to the bank in discharge of a debt due to it by said Ashby & Sons, makes no difference in regard to the extent and amount of the liability of said Ashby & Sons to said Porter; and that the debt due by the former to the latter is to be scaled as of the 19th day of April 1862, precisely as if the said new note had not been executed. That note was not an ex-tinguishment of the preexisting liability of Ashby & *463 Sons to Porter for the same debt arising from his having paid the debt to the bank for them and at their request; and though it postponed the right of action by Poi'ter against Ashby & Sons until the note became payable, yet that note not having been paid, it was competent for Porter to sue at his election either upon the original right of action or upon the new note. Whether he sued upon the one or the other, the measure of liability and the time for scaling the debt was precisely the same. The new note was given, not to change the amount of the debt, but to extend the time for its payment, in consideration of which Ashby & Sons were to pay legal interest on the amount during the period of the extension. But certainly Porter had no idea of agreeing to receive less than the principal of his debt, and that, too, after waiting twelve months for its payment. Confederate money had already depreciated, and was continuing to depreciate; and it must have been morally certain, that at the end of twelve months the depreciation would be much greater, as actually turned out to be the case. Porter no doubt believed that the debt was due him in good money, and according to that view the new note was solvable only in good money. But if we suppose that he believed the debt to be due to him in Confederate money, we cannot suppose that he intended by the new note to agree to receive in its payment Confederate money at par, though much more depreciated at the maturity of the note than at its date. We must, suppose in that case that he expected and ^intended to receive in payment of the note the value of the Confederate money paid by him for Ashby & Sons, with interest,on that value from the date of the note till payment. That even Ashby & Sons contemplated the date of the note, *464 and not its maturity, as the period at which the debt, if due in Confederate money, was to be scaled, is shown by the fact, that they stipulated for the right to pay it in flour at an agreed price, if when payment of the money was demanded they should not be ready to make such payment. Of course, the price of the flour was fixe¿ jn reference to its market value at the time of the date of the note. The act passed March 3, 1866, (Acts of Assembly 1865-’6, p. 185,) authorizes a contract in such cases “to be liquidated and settled by reducing the nominal amount due or payable under such contract in Confederate States Treasury notes to its true value at the time they were respectively made and entered into, or at such other time as may to the court seem right in the particular case.” It seems to me to be right in this particular case, according to all the circumstances, most but not all of which I have detailed, that the debt, supposing it to be a Confederate debt, should be scaled as at the time the contract was made and entered into, to wit: the date of the note, (as was done by the court below,) and not at the time of its maturity, nor at any other time. The difliculty I have had in this case has been in determining whether the debt was a good money debt or a Confederate debt. Considering it to be a Confederate debt, I have none in determining that the date of the note and not its maturity is the proper period for applying the scale. Certainly that determination does full justice to Ashby & Sons, and places them precisely where they would have stood if they had paid their own Confederate money in discharge of their debt to the bank, instead of requesting Porter to pay it for them. To apply the scale, as at the time of the maturity of the note, would do gross injustice to Porter. I am therefore for applying it as at the date of the note.
*465 The only other objection made to the decree of the court below is, that “ it was error upon any application of the scale to decree the payment of a debt due from B. Ashby & Sons out of lands belonging to the estate of B. Ashby, deceased, late one of the members of said firm, after the dissolution of the partnership, and until the individual creditors of said B. Ashby, deceased, had been provided for.”
This objection seems not to be at all relied on, and little or no notice was taken of it in the argument. At all events it is wholly unsustainable. The liability of partners for a partnership debt is joint and several, even after the death of one or more of the partners* This has been the case, even at law, ever since the enactment of the Code of 1849, chapter 144, section 13, which provided that “the representative of one bound with another, either jointly or as a partner, by judgment, bond, note or otherwise, for the payment of a debt, or the performance or forbearance of an act, or for any other thing, and dying in the lifetime of the latter, may be charged in the same manner as such representative might have been charged, if those bound jointly or as partners had been bound severally as well as jointly, otherwise than as partners.” See the note of the revisors to this section in their report, page 724. The/amendment of the law was made after the decision of the case of Morris’s adm’or v. Morris’s adm’or &c., 4 Gratt. 293, in which there was much conflict of opinion among the judges. Had the case occurred after, and been governed by the amended law, it is presumed there would have been no such conflict. For all the judges in that case concurred in holding, that “two partners having given their joint and several bond to a creditor of the firm, for a partnership *466 debt, the creditor is entitled to share with the separate creditors the separate estate of the deceased partner.”
I am of opinion that there is no error in the decree complained of to the prejudice of the appellants, and
1 am therefore for affirming it.
Decree aeeirmed.