Moncure P.
delivered the opinion- of the court.
The court is of opinion, that the contract made on the 17th day of October 1862, between hT. K. Trout and George Harnsberger, executors of Jacob Harnsberger deceased, and Samuel Simmons, for the sale by the former to the latter of a tract of land situated in Rockingham county, Containing about one hundred and forty and one-half acres, at $55 per acre, on the terms of one-fourth in hand and the balance in three equal annual payments, with a vendor’s lien to secure them, was made and entered into with reference to Confederate States treasury notes as a standard of value. That the hand payment of one-fourth of the purchase money was agreed to be paid, and was actually paid, in Confederate States treasury notes, is admitted by all parties. And the only question is, as to the deferred instalments of the purchase money, whether they are payable according to their far amount, in good money, or according to the amount due, on the supposition that the contract was made in reference to the said standard of value, as well in regard to the deferred instalments, as in regard to the hand payment of the purchase money. Our opinion, as has already, in effect, been stated, is, that in regard to both, the contract was made with reference to said standard of value.
*671 Beyond all question, if the sale had been entirely for cash, the whole amount of the purchase money would have been received in Confederate States treas ury notes, and the contract in that case would have been made in reference to them as a standard of value. But the difficulty arose from the fact, that the payment of three-fourths’" of the purchase money was by the contract deferred, and there was danger of the depreciation of the currency before the money became payable, and there was doubt as to what the amount of the depreciation would be. In this state of things, it was difficult, if not impossible, to fix upon a certain medium of payment of the deferred instalments which would do justice to both parties. The purchaser was of course unwilling to agree to pay specie or its equivalent, Having contracted in reference to a lower standard of value; and the vendors were no doubt unwilling to agree to receive Confederate States treasury notes at par in payment, without reference to the extent of depreciation at the time of the maturity of the deferred instalments respectively. Had the bonds been, in terms, for the payment of Confederate States treasury notes, they might, and no doubt would, have been construed as contracts for the delivery of a commodity, and would have been soluble by the payment of the amount in such notes, however greatly depreciated they might have been at the time of the maturity of the bonds. All that could be done therefore, in justice to all parties, was to make their contract in reference to Confederate States treasury notes as a standard of value. If they remained of the same value at the maturity of the bonds there would be no difficulty. But if they materially depreciated in value by the time of the maturity of the bonds, then justice could be done by the payment of the value of the same amount of *672 Confederate States treasury notes at the date of the contract, to be ascertained by the best rule that could! be adopted for the purpose.
That the contract was made with reference to Confederate States treasury notes as a standard of value, is, we think, very obvious; whether we look at the' time at which it was made and the surrounding circumstances, or to the evidence in the case. The sale was made on the 17th day of October, 1862, when the only, or almost only, currency which existed was Confederate States treasury notes, and that had been almost the only currency for a long time before. The 1st day of January 1862, nearly ten months before the date of the sale, was the day prescribed by law as the day between which and the 10th day of April 1865 it was made lawful for either party to a contract to show,, by parol op other relevant testimony, what was the true understanding and agreement of the parties thereto,, either express or to be implied, in respect to the kind of currency in which the same was to be fulfilled or performed, or with reference to which as a standard of' value it was made and entered into.- Such was the rarity of making a sale of real estate for anything else than Confederate States treasury notes, or, at all events, for specie or its equivalent; and such was the difficulty, if not impossibility of making such a sale for specie or its equivalent, at or about the time of the sale in this case, to-wit, the 17th of October 1862, that strong and clear evidence of an intention to make such a sale at or about that time ought to be required to prove the fact. A sale at such a time, under such circumstances, and in the absence of any such evidence, ought to be construed to be a sale in reference to Confederate States treasury notes as a standard of value. So far from there being in this *673 case strong and clear evidence of suck an intention, the great mass and weight of the evidence sustains the contrary. A great number of witnesses were examined in the case, some fifteen or twenty on each side. And most of them examined on the side of the purchaser testify to the fact that the sale was made in reference to Confederate States treasury notes as a standard of value, as well in reference to the deferred instalments of the purchase money as the hand payment. Indeed, as we have seen, in regard to the hand payment, it is admitted on all sides that such was the case, and that the money was paid and received accordingly. While many witnesses testify that the sale was according to the same standard of value in reference to the deferred instalments also, only one or two of them testify to the contrary. The most important of these is certainly one of the executors themselves, H. 3L Trout, who, no doubt, and as we happen to know, was in all respects worthy of confidence. He admits, however, that his co-executor, a son of the testator, was the chief actor in making the sale; and he testifies as to what was said and done at a sale which transpired many years before he gave his testimony. This witness testifies that “ after the land had been up some time, the impression seemed to prevail that we would not take the then currency (Confederate money); there was a suspension of probably ten to fifteen minutes, and we had a conference with the legatees, and announced that we would take the payment of that day, the down payment, in Confederate money, but would not agree to bind ourselves to take the deferred payments in Confederate money. I recollect with great distinctness, while standing by the auctioneer, being asked by some person in the crowd: {Will you take the payment which is to be made to-day in Confede *674 rate money?’ I responded: ‘Yes, we will.’ The interrogator then said: ‘ "Will you require the deferred payments in gold or silver ?’ I responded, rather playfully, Pr°bably—‘Ho, it is heavy to carry; we will take its equivalent or a legal tender for it.’” This is tibe evidence mainly relied on to show that the sale, as to the deferred instalments, was to be for good money or a legal tender. But Mr. Trout no doubt only intended to make a playful remark, not only about specie, but about legal tender, and what he said was no doubt so regarded by those who heard him, if anybody heard him. This is shown by a subsequent part of his testimony. “ I remember,” he says, “ Moore’s coming to my office before the first bond was due, and asking me if I would receive the money for Simmons’ bond, and I told him I would when it was due, unless I received instructions from the legatees not to. He came again some time after it was due, and I refused to take the money, because I had received.orders from the legatees, through George Harnsberger, not to receive it; he showed me no money on either occasion. I supposed at the time of these interviews with Moore, that the money spoken of, in which he wished to pay the bond, was Confederate money. I did not see it.” How this payment was offered to be made about the 17th of October 1868, when Confederate money was very greatly depreciated: and is it likely that this executor would have been willing, as he seems to have been, so far as he was concerned, to receive this payment in Confederate money at par, if he had considered the purchaser as under an obligation to make payment in specie or in legal tender money? The testimony of his co-executor strongly tends to prove that there was no agreement to make the deferred payments in good money. “The question was asked,” he says, “what *675 kind of money would be received? "We, in the outset, agreed to take Confederate money for the down payment—that was stated in the terms of sale—the one fourth in hand was to be paid in Confederate money. As to the bonds* I told them, it was out of my power to say what kind of money we would take by that time.”
The contract having been made in reference to Confederate States treasury notes as a standard of value, as well in regard to the deferred instalments as the ■cash payment, it follows, as a necessary consequence, that the balance of the purchase money now due must be ascertained by scaling the nominal amount due upon the bonds; and the question now is, what mode •of scaling should be adopted in this case—whether the gold standard or the property standard. This is a ■case to which the property standard may be applied, the Code providing “that, when the cause of action grows out of a sale or renting or hiring of property, whether real or personal, if the court (or where it is a jury case the jury) think that under all the circumstances the fair value of the property sold, or the fair rent or hire of it, would be the most just measure of recovery, instead of the express terms of the contract.” Code p. 980, chap. 138, § 1. The court is of opinion, under all the circumstances of this case, that the fair value of the property sold at the time of the sale, or a due proportion thereof according to the balance ■of the purchase money remaining unpaid, would be the most just measure of recovery in this case, and ought to be adopted as such measure of recovery accordingly.
And now the question is, as to the value of the land sold at the time of the sale, to-wit, the 17th day of October 1862. The court is of opinion, that the value *676 of the land at the time was thirty-five dollars cash Per acre. Without reviewing all the evidence on this subject, of which there is a great deal, such, we think,. js decided preponderance. Even one of the witnesses introduced by the complainants, the executors of Harnsberger, testifies that such, in his opinion,, was its value. William P. Sites, one of those witnesses, being asked, on cross-examination, “In October 1862, what was the Harnsberger land worth, to have been paid for in gold and silver or United States currency'? What was it worth per acre?”' answered: “From what little acquaintance I have with it, I know it very slightly, my figures on it would be $85 per acre.” And being asked, on reexamination in chief, “Do you mean $35 cash?” he answered: “Yes, sir.” And being asked, what difference certain terms of credit named in the question would make, he answered: “My figures have been $35 per acre as cash. What difference the terms of' payment stated in the question would make, I cannot say.” The testimony as to such value varies between $50 per acre and $30 per acre. Hone of the testimony introduced by the defendants fixes it at more than $35 per acre; while some of the testimony fixes the value at that sum as a cash price, and some as a price on the ordinary terms of credit. In fact, the executors were anxious to affect a sale of the land in December 1861 at forty dollars per acre, and tried to do so, but did not succeed. But the most important testimony in the case on that subject (to-wit, the value of the land in good money) is that of the three appraisers of the land appointed by the court for that purpose. They were no doubt selected for their impartiality, sound judgment and experience in such matters. They performed their duties upon oath, and ante litem molam> *677 also before tbe sale was made or perhaps thought of. They were all examined as witnesses in the ease, and all concurred in testifying that $35 per acre was, in their opinion, the fair value of the land at the time of the sale, on the 17th of October 1862.
The court is therefore of opinion, that the decree appealed from is erroneous, and ought to be reversed, and the cause remanded to be further proceeded in to a final decree in conformity with the foregoing opinion.
The decree was as follows:
This day came again the parties by counsel; and the court having maturely considered the transcript of the record of the decree aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the contract in the proceedings mentioned, made on the 17th day of October 1862, between 17. K. Trout and George Harnsberger, executors of Jacob Harnsberger deceased, and Samuel Simmons, for the sale by the former to the latter of a tract of land situated in Eockingham county, containing about one hundred and forty and a half acres, at fifty-five dollars per acre, on the terms of one-fourth in hand, and the balance in three equal annual payments, with a vendor’s lien to secure them, was made and entered into with reference to Confederate States treasury notes as a standard of value, not only in regard to the hand payment, but also in regard to the deferred payments aforesaid.
The court is further of opinion that no valid or legal tender was made of the amount of the bond for the first deferred payment, which became payable on the 17th day of October 1863.
The court is further of opinion that, under all the *678 circumstances of the case, the fair value of the proPerty sold at the time of the sale aforesaid, would be the most just measure of recovery in this case, and ought to be adopted as such measure of recovery accordingly, subject to all just credits to which the defendants may be entitled.
The court is further of opinion that the fair value of the said land at the time of the said sale, to wit, on the 17th day of October 1862, was thirty-five dollars cash per acre, with three-fourths of the amount of which value, with interest from that day, the purchaser is chargeable on account of the deferred payments, he having properly discharged the hand payment in Confederate money. The court is therefore' of opinion that the decrees rendered by the Circuit court in the cause on the 4th day of February 1874, and on the 25th 'day of April 1874, are erroneous, and it is decreed and ordered that the same be reversed and annulled, and that the appellees, E. E. Trout and George Harnsberger, executors of Jacob Harnsberger, deceased, do out of the estate of their said testator in their hands to be administered, pay to the appellants their costs by them expended in the prosecution of their appeal aforesaid here. And it is further decreed and ordered that this cause be remanded to the' said Circuit court for further proceedings to be had therein to a final decree in conformity with the foregoing opinion; which is ordered to be certified to the said Circuit court of Rockingham county.
Decree reversed.