# CHARLESTOWN.

JAMES JARRETT's ADMRS. v. JAMES M. NICKELL, ET AL.

September 9, 1876.

1. On April 7, 1862, N. borrowed of J. $2,000 in Confederate notes in Greenbrier county, W. Va., where such notes were then the general circulating currency, worth, as compared with gold, $1.40 to $1 in gold; and N thereupon executed his bond to J for $2,120, payable twelve months after date. At the maturity of this bond, Confederate notes, as compared with gold, were worth $5 to $1 in gold. In 1866 the attorney of the assignee of this note, who had been instructed to renew this note with security, or collect it by suit, or otherwise, called upon N, who informed him it was given for Confederate money. He said to N that he did not think it would make it any worse for him if he renewed it; and thereupon he did so with L as his security. The renewed bond being for the principal and interest of the old bond, without any scaling or abatement. It was payable on demand.—HELD:

*First.* The giving of the new bond was a mere renewal of the old bond, without any agreement expressed or implied to forego any abatement to which it ought to be subject, on account of the original bond being given for a loan of Confederate notes, or for any other reason.

*Secondly.* There was no usury in the transaction.

*Thirdly.* The credit to which the new bond is entitled as of the day it was given, is such as would reduce to its value in gold the $2,000 of Confederate notes, scaled as of the time the first bond became due, and interest thereon till the second bond was executed.

2 The admission of parol evidence to establish a verbal understanding to allow such credit on the new bond, does not violate the

44

1876.
August Term.

Jarrett's Admrs
v.
Nickell.

rule that parol evidence cannot be admitted to contradict, vary, or add to a valid, written instrument.

3. The act of April 7, 1875, for adjusting certain liabilities arising under contracts made during the late war, has no application to the loaning and borrowing of Confederate money. Upon such a contract the scaling must, upon common law principles, be made as of the time when the money borrowed is payable.

Writ of error to a judgment of the circuit court of Greenbrier county, entered on the twenty-sixth day of June, 1865, in an action therein, then, pending, in which Alexander F. Mathews and Joseph Jarrett, administrators of James Jarrett, deceased, were plaintiffs, and James M. Nickell and Samuel C. Ludington were defendants.

The facts of the case are fully shown in the opinion of the Court.

Hon. Homer A. Holt, judge of said circuit court presided at the hearing below.

*Mathews & Mathews*, and *Samuel Price* for said administrators and plaintiffs in error.

*Robert F. Dennis* and *A. C. Snyder* for said Nickel *et al.*, defendants in error.

GREEN, JUDGE:

James Jarrett's administrators brought an action of debt, in the circuit court of Greenbrier county, against James M. Nickell and Samuel C. Ludington, upon a bond for $2,534.45, payable on demand, and dated July 7, 1866. The defendants filed pleas of payment and usury, to which the plaintiff replied generally, and issues were joined. On June 26, 1875, by consent of parties, the cause was submitted to the court, in lieu of a jury. The defendants were allowed to make any defences, under the issues in the cause, of any matters which they could make, if said matters were specially pleaded; and thereupon the court, having heard the evidence, found that the plaintiffs were entitled to recover from the de-

fendants the sum of $779.27, with interest thereon from June 26, 1875, until paid, and judgment was accordingly rendered for said sum, and interest and costs.

The plaintiffs thereupon excepted to this action of the court, and tendered their bill of exceptions, which was signed, sealed, and enrolled. It certifies all the facts proven, as follows:

On April 7, 1862, the defendant, Nickell, borrowed of James Jarrett, jr., son of plaintiffs' intestate, $2,000 in Confederate treasury notes, for which he executed his bond for $2,120, payable in twelve months. This transaction took place in Greenbrier county, and at the time it took place, Confederate treasury notes were the general circulating currency in that county, and were valued, as compared with gold, as $1.40 to $1.

At the maturity of this bond, April 7, 1863, they were worth, as compared with gold, as $5 to $1; and at some time in 1863, said bond was assigned, for value, to plaintiffs' intestate, who, in 1866, placed it in the hands of an attorney, with directions to renew it, with security, or collect, by suit or otherwise. Being notified thereof, Nickell, the defendant, told him that this bond was given for Confederate money, and the attorney told him he did not think it would make it any worse for him to renew it; thereupon he, with defendant Ludington, as his security, executed the bond sued upon for the principal and interest of said $2,120-bond, nothing being said about usury.

When the bond sued upon was executed, Confederate treasury notes were worthless, and had ceased to circulate as money.

The plaintiffs obtained a *supersedeas* to judgment of the circuit court. The Court will take judicial notice of the fact, that the $2,120-bond was executed during the late war; that when executed, Greenbrier county was under the military domination of the Confederate Gov-

ernment, and that the war had closed, in fact, shortly before the execution of the bond sued upon.

The courts had not then rendered any decisions that would enable the parties to these transactions to form any correct idea of what might be held to be their respective rights and obligations, whether the $2,120-bond could be enforced, or whether it would be scaled, or, if scaled, whether it would be according to the value of Confederate notes, when loaned, or according to their value, when the bond became payable. In this state of uncertainty, the new bond sued on was executed, the defendant, Ludington, signing it as security, there having been no security on the original bond.

The circuit court regarded the giving of this new bond as a mere renewal of the old bond, without any agreement, either expressed or implied, to forego any abatement to which the defendants might be entitled on account of the original bond, being given for a loan of Confederate treasury notes, or for any other reason. The appellants, on the contrary, insist that the new bond was given as a compromise and settlement, and that the parties to it are barred by their contract, thus made deliberately.

I think the circuit court was right in its views, and that the giving of the new bond was no waiver of any abatement to which they might have been entitled. There was not, in this transaction, any elements of a compromise of disputed points. The defendants executed their bond for the entire amount, which, under any circumstances, it would have been possible for the plaintiffs' intestate to demand. No abatement was made, and no time was given, the new bond being payable on demand. The plaintiffs' attorney was instructed to do one of two things—to renew the old bond, with security, or to collect it, by suit or otherwise. The first of these instructions he obeyed. He did, as I understand, renew the bond, with security; he did not settle the contro-

versies arising out of the old bond. The defendant, Nickell, before the bond was renewed, spoke of it as being given for Confederate notes, and, as I infer, claimed an abatement therefor. The plaintiffs' attorney told him that he did not think it would make it any worse for him to renew the bond, and acting upon this statement, he renewed it, giving security, as required.

The evidence does not shew that it was the purpose of either of the parties that this should be a final settlement of the whole matter. The question, what abatement the defendant should have, was intended to be left open for future settlement; for, otherwise, it is obvious it would have made it worse for the defendants to renew the bond for the full amount. I infer, therefore, that it was the real understanding of the parties, that any abatement Nickell might have the right to demand on the old bond, was not to be regarded as abandoned or surrendered. No consideration was given for such abandonment or surrender; none such was intended. The whole transaction, it seems to me, amounted to an agreement that, at some future time, when, by the decisions of the courts, it could be ascertained what credit or abatement should be given on the old bond, such credit would be given on the new bond, so that the defendant, Nickell, should be in no worse condition, by reason of its having been executed.

In *Vance v. Snyder*, 6 W. Va. 31, a bond was executed, with the understanding that a credit would be given upon it, if the obligor afterwards paid an order, which had been given on the obligor, and which, before the bond was executed, the obligor had accepted. This order was afterwards paid by the obligor, and the court *held*, that a credit therefor ought to be allowed him; that the giving of the bond for the full amount, without deducting this accepted order, would not preclude the obligor from claiming the amount of it, as a credit on his bond. The court say, "that the allowance of such credit is no infringement on the general rule, 'that parol evi-

dence cannot be admitted to contradict, vary, or add to a valid written instrument,' such verbal agreement neither contradicts, varies, or adds to the bond, as such agreement is not inconsistent with the terms of the bond." In that case the obligor had already accepted the order, and being thus bound to pay it, he might very properly have had the amount deducted before he gave the bond, but his failure to do so, did not, in the opinion of the court, preclude him from afterwards claiming it as a credit upon the bond, in a suit upon it at law; so here, if the amount of the abatement, to which the orig-inal bond was subject, could have been ascertained correctly, it might very properly have been abated, before the new bond was given ; but the failure to do so, with an understanding expressed or implied, that it might afterwards be done, will not prevent the obligors from claiming this abatement as a credit on the new bond. Such parol agreement neither contradicts, varies, or adds to the bond, as it is not inconsistent with the terms of the bond.

This case differs essentially from the case of *James Jarrett's admrs v. S. C. Ludington*, &c., decided at the present term of this court.

In that case, some time after the first bond was executed, a large payment had been made upon it, in Confederate bonds, very much depreciated. There was in the taking of the new bond, a valuable consideration given for the abandonment by the obligors of any claim of abatement, for the obligee by accepting the new bond abandoned any claim he might have, for an abatement, by reason of the payment made to him in the depreciated Confederate bonds.

Again, in that case, the new bond was executed only by the obligors in the old bond, no additional security being given, so that the principal object, which, it would seem, the parties had in view, must have been the final

settlement of controversies, and not the better securing of the debt. Lastly, the evidence in that case does not, as in this, show any statement made by the parties at the time the new bond was given, indicating that it was their purpose to leave open disputed questions.

There was no usury in these transactions. The original bond was for $2,120, payable one year after date, and was given for a loan of $2,000; this, if it had been paid promptly, was the same as a bond for $2,000, payable in one year, and bearing interest from date, at six per cent per annum, and if not paid promptly, its effect would be, that without any renewal of the bond, it would have borne compound interest, at the end of the first year. The court in such case, would relieve from the compound interest as oppressive, but the attempt to take it is not usury. *Childers v. Deane*, 4 Rand. 406. *Fultz v. Davis*, 26 Gratt. 911.

There was no usury in the taking of the new bond; there was no forbearance of the collection of the debt, the new bond being taken payable on demand and, though taken for a much larger sum than the courts now hold was properly due, yet, when it was taken, the parties could not tell what was really due, and the implied understanding, as we have seen, was, that it would be credited with whatever amount it included beyond what might be ascertained to be really due.

The only remaining question is what should be allowed as a credit on the new bond, by reason of any abatement that the appellants were entitled to on the original bond, by reason of its being given for a loan of Confederate notes? The act of the legislature of April 7, 1875, for the adjustment of certain liabilities arising under contracts, made between May 1, 1861 and May 1, 1865, can have no influence on the determination of this question. The contracts named in that act are only *contracts, expressed or implied. for the sale or purchase of any real or personal property.* In this, as in some other respects, it

differs from the acts of the Virginia Legislature, found in Code of Virginia, 1873, ch. 138, secs. 1 and 2, p. 979. The Virginia act applies to *any contract expressed, or implied.* The Virginia decisions, therefore, would be an unsafe guide, in this case, though they throw some light upon the subject. The Virginia acts are held to have entirely abrogated the common law rule which prohibits proof of any cotemporaneous agreement, whereby a written instrument would be altered, or modified; they hold, that the legislature, in its discretion, may, without violating the obligations of contracts, enlarge the evidence which may be used, the right to be governed by existing rules of evidence not being a vested right; that, while the common law only permitted parol evidence, to show what was the true understanding and agreement of the parties, only when the contract was verbal, yet this rule, by the Virginia acts, extended to all contracts made during the war, whatever their form, verbal or written, sealed or unsealed; that parol, or other relevant testimony is the means allowed in all such cases; the object to be attained is the true understanding and agreement of the parties, such evidence not being introduced, as it was at common law, merely " to explain a latent ambiguity."

So construing these acts, the courts of Virginia have permitted oral testimony to be introduced, though the bond, on its face, expressly declared in what sort of funds it was to be paid. They have permitted such testimony to show the conversations and actions, both before and after the transactions; the value of the property sold, when a sale was the consideration of the bond, and any evidence that, in any way would show the implied understanding of the parties. They have, when the contract was for the sale of property, with reference to Confederate notes, as the standard of value, scaled the debt, when the bond was payable at a future time, by the true value of Confederate money when the bond was given, and not when it fell due; this true value has sometimes

been found by comparing it with gold, and sometimes by taking the fair value of the property as the equivalent of the amount of Confederate notes for which it was sold.

When the transaction was a loan of Confederate money, the scaling has always been by a comparison of the value of Confederate notes and gold. They, at first, held, that this scaling should be made, as of the time the bond given for the loan fell due; and while this decision, made by a divided court, has never been expressly overruled, yet subsequent decisions have apparently departed from the principles of this decision. See *Dearing's admx v. Rucker*, 18 Gratt. 426; *Crawford v. Holstead*, 20 Gratt. 211; *Caldwell v. Craig*, 21 Gratt. 132; *Pharis v. Dice*, 21 Grat. 303; *Hilb v. Peyton*, 21 Gratt. 386; *Moses v. Trice*, 21 Gratt. 556; *Meredith, &c., v. Salmon*, 21 Gratt. 762; *Sexton v. Windell' admx.*, 23 Gratt. 534; *Tams v. Brannaman*, 23 Gratt. 809; *Effinger v. Kenney*, 24 Gratt. 116; *Moon v. Richardson*, 24 Gratt. 219; *Earp v. Boothe*, 24 Gratt. 368; *Mereweather 'v. Dowdy*, 25 Gratt. 232; *Mott v. Carter's admr.*, 26 Gratt. 127; *Ashby's admr., &c., v. Porter*, 26 Gratt. 455; *Moore v. Harnburger's exors*, 26 Gratt. 667; *Fultz v. Davis*, 26 Gratt. 903.

Though these cases throw much light on our act, which resembles the Virginia acts in many respects, yet they would be an unsafe guide in the case before us, as our act has no application to a contract for a loan of money.

In deciding this case we must determine what abatement is to be allowed on the original bond by common law principles, unchanged by statute.

The Supreme Court of the United States, in the case of *Thorington v. Smith*, 8 Wall., p. 1., decided that parol evidence might be admitted to prove that by the word "dollars," in a bond executed in Alabama, in 1864, "Confederate dollars" were meant.

45

'This decision was based upon the recognized common law principle that parol testimony is admissible to explain a latent ambiguity, such explanation of latent ambiguity, being no alteration or modification of a written contract. A bond payable in dollars, ordinarily, means payable in such dollars as are recognized by the laws of the United States, and parol evidence would not generally be admissible to show any other sort of dollars were meant, as such evidence would modify the written contract; but if it is shown that the bond was given by a foreigner, in a foreign country, parol evidence would be admissible to show what kind of dollars were meant, and the real value of the coin known in such foreign country as a " dollar," for, under such circumstances, the word "dollar" in the bond would mean such foreign dollar, and not a dollar of United States currency.

The parol evidence in such case does not vary the contract, but simply explains a latent ambiguity.

If the bond was executed, as in this case, in a portion of the country under the domination of the Confederate Government, and where the currency was Confederate notes, the words "dollars" would, for like reason, be regarded as meaning "Confederate dollars," and parol evidence would, on common law principles, be admissible to show this, and to show their value. Such evidence does not vary or modify the written contract, but merely explains a latent ambiguity. The evidence in the present case brings it within the principle laid down in *Thorington v. Smith,* and the $2,120 bond must be read as though it were a bond for " 2,120 Confederate dollars."

When this bond was executed, as was said by Judge Joynes in *Dearing's admx. v. Rucker,* 18 Grat. 438, "Confederate notes were not money, in the legal sense, though they passed as such, like bank notes. In a legal sense they were like bank notes—a mere commodity. They were a commodity which was measured or enumerated in dollars and cents, like lawful money. A

contract for the payment of so · many dollars of Confed- <span>1876.<br>August Term.</span>
erate notes, was a contract · to pay so many dollars of<u>Jarrett's Admrs</u>
Confederate notes, or so many Confederate dollars. The <span>v.<br>Nickell.</span>
specification of dollars·served only to measure the quan-
tity of the notes, so that in every such contract the
quantity of notes to be delivered was ascertained, though
their· value might be ·uncertain. The contract was for
quantity, only, and not for value. The remedy for the
breach of such a contract is by covenant or assumpsit to
recover damages for the failure ·to deliver a · specific
quantity of notes, and the measure of damages is
the value of the notes at the time when they ought to
have been delivered. Beirne, v. Dunlap, 8 Leigh. 514;
Butcher v. Carlile, 12 Gratt. 520. These cases· fully es-
tablish these principles in reference to contracts for the
payment of so many dollars in bank notes. I cannot
imagine a reason why they should not apply equally to
contracts to pay so many dollars in Confederate notes.

When, therefore, the contract is for the payment of
Confederate notes, in express terms, or so many dollars
in Confederate notes, the sum to be recovered, in an ac-
tion upon it, is the value of the quantity of notes called
for at the day of payment, whether the payment was to
be made presently, or, as we say, 'on demand,' or at a
future day. In other words, the scale of depreciation
must be applied at the day when the money was paya-
ble. He further says: "In the case of a bond calling
in terms for so many dollars in Confederate notes, at a
future day, a tender of that quantity of Confederate notes,
or of that number of dollars in Confederate notes, on the
day of payment, would satisfy the contract, though they
might have depreciated since the date of the contract, for
the contract is for quantity, not for value. Beirne v.
Dunlap, Butcher v. Carlile, ubi supra. And I can
imagine no reason why such a tender would not be
equally good when the agreement for Confederate notes
is not expressed in the bond, but is supplied by evidence

*aliunde.* The agreement of the parties is, in all respects, the same; the only difference is in the form of proof. The rights and liabilities of the parties depend on their agreement, and not on the evidence by which it is proved."

This reasoning is certainly sound where, as in this case, we are confined, by the common law rule, simply to explain the meaning of the words "dollars" in the bond. It is not necessary to decide whether this reasoning is equally sound under the Virginia acts, which, in such case, permitted the true understanding and agreement of the parties, expressed or implied, to be proven by parol, or other relevant evidence, even though the words of the contract were thereby varied.

Judge Moncure, in the same case, in an able opinion, insists that the reasoning of Judge Joynes is unsound, when the Virginia acts are taken into consideration; but be that as it may, the reasoning of Judge Joynes is unanswerable, if we leave out the consideration of the Virginia acts.

I am, therefore, of the opinion that this bond of $2,120, should be regarded as obliging the obligors to pay that amount in Confederate dollars, on April 7, 1863, and their failure to meet this obligation, gave the obligor in the bond a legal demand upon them for $424, the value of the $2,120 Confederate dollars, as of the time it ought to have been paid. Of this sum, however, only $400 would properly bear interest, as $24 of it was interest, and we have seen that the law does not allow the recovery of compound interest in such a case.

On the seventh day of July, 1866, this debt, principal, and interest, amounted to $502. The bond, then taken of the obligors, was $2,534.45, a sum exceeding the true amount due by $2,032.45, which is, therefore, the abatement which the obligors were entitled to on the original bond. By the understanding of the parties, the bond sued on ought to be credited as of date July 7, 1866,

with $2,032.45, leaving the balance then due $502. This sum, with interest thereon to date, of the judgment rendered by the circuit court, June 26, 1875, amounts to $772.53; this is the true amount for which the judgment should have been rendered; it is $6.74 less than the judgment which was rendered.

The judgment of the circuit court must be corrected to this extent, and made a judgment for the plaintiffs against the defendants, for $772.53, with interest from June 26, 1875, till paid, and their costs expended in the circuit court; and this judgment, thus amended, must be affirmed, with costs, in this Court, and damages to the appellees, according to law.

The other Judges concurred.

JUDGMENT AFFIRMED, AS CORRECTED IN APPELLATE COURT.